IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| FRIENDS OF MT. HOOD; HOOD RIVER VALLEY RESIDENTS COMMITTEE; NORTHWEST ENVIRONMENTAL DEFENSE CENTER; OREGON NATURAL RESOURCES COUNCIL, ACTION; PORTLAND AUDUBON SOCIETY; MAZAMAS; SIERRA CLUB COLUMBIA GROUP FOREST COMMITTEE and AMERICAN LANDS ALLIANCE,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, a federal agency; ROBERT WILLIAMS, as Regional Forester; RICHARD FERRARO, as Deputy Regional Forester; ROBERTA MOLTZEN, as Mt. Hood National Forest Supervisor;<br><br>Defendants, | NO. Cv 97-1787-KI<br><br>OPINION |

MT. HOOD MEADOWS OREGON, LTD., )
and MT. HOOD MEADOWS OREGON )
LIMITED PARTNERSHIP dba )
MT. HOOD MEADOWS DEVELOPMENT)
CORP., )
            Defendants-Intervenors. )
_____ )

      Christopher Winter
      Ralph O. Bloemers
      Cascade Resources Advocacy Group
      917 S. W. Oak Street, Suite 417
      Portland, Oregon 97204

      Karl G. Anuta
      Sokol & Anuta, P.C.
      735 S.W. First Avenue
      Portland, Oregon 97204

            Attorneys for Plaintiffs

      Karin J. Immergut
      United States Attorney
      District of Oregon
      Stephen J. Odell
      Assistant United States Attorney
      1000 S. W. Third Avenue, Suite 600
      Portland, Oregon 97204-2902

      Owen L. Schmidt
      U. S. Department of Agriculture
      Office of the General Counsel
      1220 S. W. Third Avenue
      1734 Federal Building
      Portland, Oregon 97202

      Pamela S. West
      U.S. Department of Justice
      Environment and Natural Resources Division
      General Litigation Section
      601 Pennsylvania Avenue, N.W.
      P.O. Box 663
      Washington, D.C. 20033-0663

Mark A. Nitczynski
U.S. Department of Justice
Environmental Defense Section (Denver Field Office)
999 18th Street
Suite 945, North Tower
Denver, Colorado 80202

      Attorneys for Federal Defendants

Per A. Ramfjord
Stoel Rives LLP
900 S.W. Fifth Avenue, Suite 2300
Portland, Oregon 97204-1268

Richard H. Allan
Ball Janik LLP
One Main Place
101 S.W. Main Street, Suite 1100
Portland, Oregon 97204-3219

      Attorneys for Defendants-Intervenors.

KING, Judge:

Numerous environmental organizations filed this action alleging that activities at Mt. Hood Meadows ski area violate the National Forest Ski Area Permit Act of 1986 ("SAPA"), 16 U.S.C. § 497b, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, and the Administrative Procedures Act ("APA"), 5 U.S.C. § 501.[1] Defendants are the United States Forest Service ("USFS") and some of its employees acting in their official capacities (collectively, the "Federal Defendants"). Defendant-intervenors are two business entities that operate the ski area, Mt. Hood Meadows Oregon Ltd and Mt. Hood Meadows Development Corp. (collectively, "MHM"). Plaintiffs are

---

[1] Plaintiffs' claims under the Clean Water Act, 33 U.S.C. § 1365, were settled.

concerned about management at MHM ski area over the last 30 years and activities related to a proposed expansion.

Before the court is Plaintiffs' Objections to Defendants' Supplemental Information Report.

## FACTS

I previously granted summary judgment in favor of plaintiffs on a NEPA claim after concluding that the SEIS did not include a reasonable alternative suggested by plaintiffs concerning parking at the ski area. In all other respects, I approved the 1997 Revised Master Plan. The parties conferred and proposed a procedure in which the USFS would draft an SIR which would have limited review by plaintiffs and MHM, who could file objections with me rather than restart the administrative appeal process. The parties jointly proposed a Permanent Injunction, which I entered on June 1, 2001. It states, in part:

> 2. The Court enjoins the federal defendants and MHM from proceeding with any project at the Mt. Hood Meadows Ski Area that has a direct material effect on parking facilities or that materially increases the presently approved parking load.
>
> 3. The Forest Service shall prepare and submit to the Court a Supplemental Information Report (SIR) to address the alternative of decreasing parking at the Mt. Hood Meadows Ski Area below the level authorized prior to the adoption of the 1997 Master Plan. The Court will retain jurisdiction pending submittal of the SIR and review of the SIR by the Court.
>
> (a) The sole purpose of the SIR will be to make a threshold determination of whether the parking alternative warrants detailed study comparable to the alternatives considered in detail in the NEPA documents.

MHM retained a consultant, Ecosign Mountain Resort Planners, Ltd. ("Ecosign") to study the situation. Ecosign released a report on January 22, 2002. SIR AR 106-18. Ecosign studied four alternatives by varying the parameters of People At One Time ("PAOT") from 8,600 as in

the 1978 Master Plan to 13,900 as in the 1997 Revised Master Plan and decreasing parking either by approximately 3 or 6 acres from the 1978 Master Plan allocation of 22.5 acres. All four scenarios assumed that MHM would operate a bus transit station to transport displaced skiers from a lot just east of the Portland International Airport ("PDX").

In addition to the Ecosign study, USFS evaluated a 1999 Mount Hood Transit Feasibility Study created by the Oregon Department of Transportation ("ODOT Study"). In December 2002, USFS prepared a draft SIR and gave it to MHM and plaintiffs for comments. The expert from Ecosign, Dave Felius, was deposed but the parties were not able to reach agreement on more extensive discovery, including a deposition of plaintiffs' expert.

USFS filed the final SIR on May 23, 2005. It contains a summary paragraph:

> **SUMMARY:** The Forest Service finds that Plaintiffs' parking idea is not a reasonable alternative and for this reason did not warrant detailed analysis in the December 1996 Mt. Hood Meadows Ski Area Master Plan Final Supplemental Environmental Impact Statement. This finding, explained in this report in detail, is based on the fact that Plaintiffs' parking idea is more costly than could be sustained by the Ski Area, would not increase the number of skier visits to the Ski Area, would not be acceptable to the permittee, and if done unilaterally by the Forest Service would expose the Forest Service to costly claims.

Defendants' Notice of Filing of the Final Supplemental Information Report, p.1 of Final SIR.

The SIR considered an off-site parking lot located in an East Portland transit facility so that acreage could be considered that may be more reasonably available than acreage on Highway 26 near Portland. It noted that a logical location would be near PDX. The SIR chose to study 3 and 6 acre reductions based on the fact that buffering the East Fork Hood River would reducing parking by approximately 3 acres and removing the annex parking lot at Mitchell Creek would also reduce parking by approximately 3 acres. The alternatives studies considered either or both of those reductions.

The SIR considered the economics of the proposed alternatives:

> If the resort were to remove 3 or 6 acres of parking, both would have a considerable economic impact on the ski area. The analysis prepared by Ecosign estimated the total cost of providing an off-mountain transit facility at approximately $27 per round trip seat. The analysis estimated if this cost were spread over all skier visits it would raise the price of a lift ticket by over $10 if 3 acres were removed, and almost $17 if 6 acres were removed. However, this cost just looks at replacing the skier visits that would be lost from the reduction in parking and not increasing skier visits which was one of the primary purposes of the new Master Plan (AR pages 628-630). The report goes on to display that in order to achieve a 12,500 PAOT in the Master Plan it would require 8000 skiers per day to take a bus if 6 acres of parking were removed. This would require a total of 200 buses, capital investments of over $17 million and total operation costs of $8.9 million per year.

SIR at 3.

The SIR realized that if these transportation costs were passed on to skiers, "visitation and revenues would radically drop due to the available of more reasonably priced recreation at the surrounding ski areas." SIR at 4. The ODOT study concluded that skiers would be willing to pay $8.80 for good transit service. If MHM tried to maintain visitation levels and absorb the increased operating costs, it "would likely fail financially in less than one operating season due to operating costs which would significantly exceed cash flows." SIR at 4.

The SIR also noted that MHM stated its intent to withdraw its request for a new Master Plan before accepting a reduction in existing parking. MHM viewed any attempt to remove parking facilities that were already approved and constructed as a unilateral permit amendment which would give rise to claims against the government based on MHM's reliance on the existing level of parking in its investment in other facilities at the ski area.

## LEGAL STANDARDS

The EIS is required to "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." It must also include "reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(a), (c). The rule of reason guides the choice of alternatives and the extent each must be discussed. Only reasonable or feasible alternatives must be considered. Carmel-by-the-Sea v. United States Department of Transportation, 123 F.3d 1142, 1155 (9th Cir. 1997). The EIS does not need to consider an infinite range of alternatives, alternatives that are not significantly distinguishable from others actually considered, alternatives which have substantially similar consequences as others considered, alternatives that are unlikely to be implemented, or alternatives that are inconsistent with its basic policy objectives. Id.; Headwaters, Inc. v. Bureau of Land Management, 914 F.2d 1174, 1181 (9th Cir. 1990); Muckleshoot Indian Tribe v. United States Forest Service, 177 F.3d 800, 813 (9th Cir. 1999). "A viable but unexamined alternative renders [the] environmental impact statement inadequate" however. Muckleshoot, 177 F.3d at 814 (internal quotation omitted).

When reviewing the adequacy of a NEPA document, the Ninth Circuit uses a "'rule of reason' that asks whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.' Under this standard, '[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end.'" Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997) (citation omitted) (quoting Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519

(9th Cir. 1992)) (reviewing EIS); Klamath-Siskiyou v. Bureau of Land, 387 F.3d 989, 992 (9th Cir. 2004) (reviewing EA).

Under the APA, the court may overturn an agency action only if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377, 109 S. Ct. 1851 (1989); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998), cert. denied, 527 U.S. 1003 (1999). In determining whether an agency decision is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Marsh, 490 U.S. at 378.

## DISCUSSION

I.  Kloster Declaration

Plaintiffs' expert, Tom Kloster, filed a declaration explaining his concerns with the analysis in the SIR and why a modified off-site park-and-ride alternative would have been more feasible. USFS and MHM contend that the declaration should be struck because it is not part of the administrative record. Plaintiffs insist that the procedure we are following here is not a formal administrative proceeding. Thus, plaintiffs argue that there is no administrative record limiting what the court can review.

I disagree. Many things have changed since the Permanent Injunction was entered in 2001. Counsel has changed. USFS procedures have changed, including that it now does conceptual master plans and actual project planning concurrently. The Ninth Circuit has reined in the use of SIRs to some extent. See Idaho Sporting Congress Inc. v. Alexander, 222 F.3d 562, 565-68 (9th Cir. 2000). I have more experience. In hindsight, I doubt that the parties and I

would have embarked on this path. But here we are. I believe that if an agency acts, there is an administrative record. USFS must agree because it filed a nearly 700 page record of the actions leading up to the SIR. Plaintiffs contend that the Felius deposition testimony is in the nature of discovery in a civil case and is not normally part of a case reviewing an administrative record. Although I agree that it is unusual, I know of no reason that the Felius deposition testimony cannot be part of the record. He was deposed prior to the release of the SIR.

Extra-record materials may be relied upon by the court under a few exceptions: (1) if necessary to determine if the agency considered all relevant factors and explained its decision; (2) if the agency relied on documents not in the record; (3) to explain technical or complex subject matter; or (4) if plaintiff makes a showing of agency bad faith. Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005). Plaintiffs do not attempt to argue that any of these apply. Consequently, I strike the Kloster Declaration.

Plaintiffs argue that they were always willing, and are still willing, to make Kloster available for a deposition. Essentially, they argue that it is unfair to have Felius's testimony as part of the record while Kloster's is not. It is true that the parties consulted with me prior to the Felius deposition. When I agreed that it could occur, I knew of no one objecting to the deposition, other than possibly Mr. Felius. But I also had no idea that my acquiescence would be used to support an argument that there is no administrative record here. Nothing prevented plaintiffs from putting Kloster's declaration into the record at the time they submitted their comments on the draft SIR. That would have allowed USFS to consider them when changes could still be made.

Although I strike the declaration, I also note that many of plaintiffs' arguments can be made without its support because they are based on common sense. Thus, I do not think the decision hurts plaintiffs in any way.

II.  Plaintiffs' Objections to the SIR

Plaintiffs argue that USFS incorporated unjustified assumptions into the analysis that predetermined the outcome of the economic analysis and failed to consider any of the benefits that would result from an off-site parking alternative.

A.  Choice of Assumptions

First, plaintiffs argue that USFS should have also studied an alternative based on using parking to limit future growth rather than decreasing parking. Plaintiffs would comply with the injunction language, which requires a study of decreasing parking below the levels authorized in the 1978 Master Plan, by limiting the decrease to 0.4 acres which would be turned into a bus drop-off area.

USFS chose the 3 and 6 acre decreases based on plaintiffs' comments submitted on the draft SEIS. ROD AR 295-96. Plaintiffs noted that to make the plan viable, namely to get people on buses, there was a need to reduce existing parking at the main base and eliminate the overflow parking lot on Mitchell Creek. Plaintiffs also spoke of restoring the riparian areas near the main lot. The USFS calculated that these options each take 3 acres. Plaintiffs do not dispute that calculation, but object to limiting the study to those two options.

I first note that the language in the injunction, which plaintiffs jointly proposed, requires a study of decreased parking. Thus, an alternative that keeps the level of parking the same does not comply with the injunction. Plaintiffs argue that the decrease should have been limited to

0.4 acres. USFS was faced with picking a few particular alternatives to study. It chose to return to plaintiffs' original comments which translate to either a 3 or 6 acre reduction. Although USFS was not prohibited from studying more options, including the one plaintiffs now champion, I cannot say that it acted arbitrarily and capriciously by concentrating on the ones that plaintiffs originally proposed.

Second, plaintiffs object to the USFS assuming that a reduction in parking must involve the removal of asphalt. Plaintiffs propose that the areas could remain paved and be used for snow storage or bus parking. The SIR assumed it cost $158,000 to remove asphalt from 6 acres of parking and restore it to vegetative cover which meets the Standard and Guidelines in the Mt. Hood Forest Plan. Although this is higher than the Ecosign estimate of $60,000, USFS had an estimate for removing and recycling the pavement of over $88,000, without including the rehabilitation costs.

The alternative based on increased skier capacity, as the revised Master Plan allows, with a 3 acre reduction in parking has a capital investment of over $14 million and total operating costs of $7.5 million dollars per year. SIR AR 147. The inclusion of $158,000 is truly a small drop in the bucket and would not affect the decision on whether the alternative is reasonable.

Third, plaintiffs object to the USFS's choice of studying alternatives with the transportation center located on purchased land near PDX rather than at a free location near Gresham or Sandy.

Ecosign believed the most economical way to provide the transportation would be to establish a transit center at a single location on the edge of Portland. This would allow the most frequent service to encourage skiers to take a bus. Skiers tend to arrive at the ski area during a

2.5 to 3-hour period in the morning. SIR AR 109. Ecosign assumed that the transit center would need a place where hundreds of people could wait for a bus, out of the rain and with access to restrooms. Ecosign also noted that if park and ride lots were available on weekends, presumably for some fee, they would likely not have sufficient capacity to accommodate both work commuters and skiers on weekdays, particularly on school holidays. If it was possible to make these arrangements, however, Ecosign calculated that it would reduce the overall cost by up to $0.81 per seat from the original calculated cost of $27.81. SIR AR 164-65, 202.

One of the extremely expensive factors in the alternatives Ecosign studied is the cost to purchase the buses. To reduce parking by 3 acres, Ecosign calculated that 30 buses would be needed at a purchase cost of $11.1 million. To increase PAOT to 12,500 along with decreasing parking by 3 acres, the number of buses rises to 170. SIR AR 110, 116-17. There are also operating costs for the buses. Although buses can be leased or chartered, costs are associated with these methods also. Moreover, RAZ and Grayline previously told MHM that they were unwilling to contract for service with this many skiers due to lack of demand for that many buses during the remainder of the year. SIR AR 167.

Most importantly, the number of buses is driven in part by the fact that the distance to the ski area and the hours during which skiers want to make the trip do not allow a bus to make two round trips in one day. Plaintiffs have not shown that a Gresham or Sandy transit center would alleviate this limiting problem. But even if it did, the number of buses would only be cut in half, still leaving a huge capital and operating expense.

In summary, USFS's choice of assumptions in its study was not arbitrary and capricious.

B. Failure to Consider Benefits from Off-site Parking

Plaintiffs object to USFS's failure to consider the benefits associated with off-site parking. In particular, plaintiffs point to the traffic improvement that would be expected on Highway 26 and the environmental benefits from less paved surfaces, less snow removal into the fragile wetlands and creeks, and less impact in general on the alpine environment.

USFS did consider the possible benefits to traffic congestion on Highway 26. The Ecosign report contains a section on the impact on highway traffic for each of the four scenarios. It concluded that the improvements in traffic under some of the scenarios would only be for a few years. SIR AR 115-17. Ecosign gave a long explanation of their traffic pattern analysis in response to plaintiffs' comments on the draft SIR. SIR AR 163-64.

The tangential environmental benefits were not given consideration. The purpose of the SIR, however, was to determine "whether the parking alternative warrants detailed study comparable to the alternatives considered in detail in the NEPA documents." In light of the economic analysis and MHM's stated intent to withdraw its request for a new master plan if a reduction in parking was required, SIR AR 106, the failure to provide a more detailed environmental benefit analysis is neither an arbitrary and capricious act on the part of USFS nor sufficient evidence to conclude that USFS did not take a hard look at the narrow issue before it. I also acknowledge the argument now made to me that any reduction in parking would be a unilateral amendment of MHM's permit which could lead to the government's liability for the investments MHM made in reliance on its permit and already approved parking level. I consider this argument a significant one.

PAGE 13 - OPINION

C. <u>Summary</u>

The range of alternatives to be studied in an EIS is "bounded by some notion of feasibility." <u>Laguna Greenbelt, Inc. v. U.S. Dept. of Transportation</u>, 42 F.3d 517, 524 (9th Cir. 1994) (quoting <u>Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council</u>, 435 U.S. 519, 551 98 S. Ct. 1197 (1978)). The range of alternatives "need not extend beyond those reasonably related to the purposes of the project." <u>Id.</u> Here, the purpose of the overall project is to allow the increase in skiers at MHM which I previously approved in the Revised Master Plan.

I conclude that the choices USFS made in formulating the SIR were not arbitrary and capricious, that USFS gave the required "hard look" to the issue, and that USFS did not make a clear error of judgment. The parking alternative is not a reasonable or feasible one and consequently does not require further study in an EIS.

**CONCLUSION**

I dissolve the Permanent Injunction entered on June 1, 2001. USFS may proceed with the parking provisions in the 1997 Revised Master Plan.

Dated this   7th   day of September, 2005.

                                           /s/ Garr M. King
                                           Garr M. King
                                           United States District Judge